**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **REMZA OMEROVIC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:06CV1221 HEA** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION, MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's

final decision denying the application of Remza Omerovic for Supplemental

Security Income under Title XVI of the Social Security Act. Plaintiff has filed a

Brief in Support of Plaintiff's Complaint. (Document Number 11). Defendant has

filed a Brief in Support of the Answer. (Doc. No. 12).

**Procedural History**

On October 28, 2003, plaintiff filed her application for Supplemental Security

_____

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue
became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action.
See Fed.R.Civ.P. 25(d)(1).

Income benefits, claiming that she became unable to work due to her disabling condition on November 1, 2000. (Tr. 108-09).[2] This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 3, 2006. (Tr. 97-101, 10-20). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 16, 2006. (Tr. 8, 4-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on November 8, 2005. (Tr. 23). Plaintiff was present and was represented by counsel. (Id.). Plaintiff's daughter and an interpreter were also present. (Id.). The ALJ admitted all of the exhibits into the record. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she lived in St. Louis, Missouri, and she did not know her date of birth or age. (Tr. 24-25). Plaintiff presented an identification card which indicated that she was born on

---

[2]Plaintiff has filed two prior applications for Supplemental Security Income benefits, both of which were denied after administrative hearings in a written opinion by an ALJ. (Tr. 48-66).

March 25, 1950.  (Tr. 24).  Plaintiff testified that she was born in Bratunac, Bosnia. (Tr. 25).  Plaintiff stated that she is married to Alija Omerovic.  (Id.).

Plaintiff testified that she has never attended school and that she cannot read or write in any language.  (Id.).  Plaintiff stated that she is illiterate and sick.  (Id.). Plaintiff testified that she places a mark on documents that she signs.  (Tr. 26). Plaintiff stated that she was fifteen when she married Alija Omerovic.  (Id.). Plaintiff testified that she lives with her husband in a house.  (Id.).  Plaintiff stated that she did not remember when she came to America, although she knows it has been at least five years.  (Id.).  Plaintiff testified that she has a green card.  (Id.).

Plaintiff testified that she has four children.  (Tr. 27).  Plaintiff stated that all of her children live on their own.  (Id.).  Plaintiff testified that her children's names are Munib, Zuhdija, Nenad, and Mina.  (Id.).  Plaintiff stated that all of her children live in America and they all "have their own lives."  (Tr. 28).

Plaintiff testified that when she lived in Bosnia, her husband worked and she stayed at home and cared for the children.  (Id.).  Plaintiff stated that she did not do any shopping and that she has never been to a store.  (Id.).  Plaintiff testified that her husband did all of the shopping.  (Id.).  Plaintiff stated that she was in Bosnia when the war started.  (Id.).  Plaintiff testified that she saw a lot of things during the war, including rapes and beatings.  (Id.).  Plaintiff stated that she was beaten by the Serbs

and Checzniks, which is why her "nerves are sick." (Tr. 29). Plaintiff testified that she and her family spent time in a camp in Bosnia for a long time, although she did not know how long. (Id.). Plaintiff stated that she and her family eventually went to Germany. (Id.).

Plaintiff testified that she applied for disability benefits because she is sick and does not work. (Tr. 30). Plaintiff stated that she has problems with her head and her nerves. (Tr. 31). Plaintiff testified that she falls. (Id.). Plaintiff stated that she cannot cook, go to the store, or even answer the phone. (Id.). Plaintiff testified that she cannot "handle anybody," including her husband sometimes, and she cries often due to her nerves. (Id.). Plaintiff stated that she sees Dr. Santos every month for her nerves, and that Dr. Santos prescribes medication. (Id.). Plaintiff testified that the medication helps her and allows her to sleep through the night. (Tr. 32). Plaintiff stated that a Bosnian woman comes to her home once a month to help her with her medication. (Id.). Plaintiff testified that she also sees Dr. Denise Hooks-Anderson at Family Health Center. (Id.). Plaintiff stated that she has been hospitalized three times. (Id.). Plaintiff testified that Dr. Hooks-Anderson treated her for a high fever, an ulcer, and nausea. (Tr. 33).

Plaintiff stated that she uses a cane to help her walk because her legs are swollen. (Id.). Plaintiff testified that her legs started to swell five years prior to the

hearing.  (<u>Id.</u>).  Plaintiff stated that she also experiences pain in her legs.  (<u>Id.</u>).

Plaintiff testified that she takes medication for her legs.  (<u>Id.</u>).  Plaintiff stated that

the medication helps somewhat.  (<u>Id.</u>).

Plaintiff testified that she has problems with her stomach.  (Tr. 34).  Plaintiff

stated that she experiences a stabbing pain in her stomach.  (<u>Id.</u>).  Plaintiff testified

that this occurs for an hour at a time every day.  (<u>Id.</u>).

Plaintiff stated that she also has back pain.  (<u>Id.</u>).  Plaintiff testified that her

back hurt during the hearing.  (<u>Id.</u>).  Plaintiff stated that she has back pain every

day.  (Tr. 35).  Plaintiff testified that she takes medication for her back pain, which

provides significant relief.  (<u>Id.</u>).  Plaintiff stated that she has high blood pressure.

(<u>Id.</u>).  Plaintiff testified that she takes medication for her blood pressure daily, which

makes her feel better.  (<u>Id.</u>).

Plaintiff stated that she also experiences pain in her head, neck, and eyes.

(<u>Id.</u>).  Plaintiff testified that she wears eyeglasses and that she is unable to see

anything without them.  (Tr. 36).  Plaintiff stated that she is able to see when she

wears her eyeglasses.  (<u>Id.</u>).

Plaintiff testified that she cannot walk at all.  (<u>Id.</u>).  Plaintiff stated that she

cannot lift anything.  (<u>Id.</u>).  Plaintiff testified that the heaviest object she can lift is

her cane because her arms are swollen.  (<u>Id.</u>).  Plaintiff stated that she cannot stand.

(Id.).  Plaintiff testified that she can only sit down for about a half hour.  (Tr. 37).

Plaintiff testified that she cannot cook.  (Id.).  Plaintiff stated that her husband does all the cooking.  (Id.).  Plaintiff testified that her husband also does all the cleaning.  (Id.).  Plaintiff stated that she is unable to do any cleaning.  (Id.).  Plaintiff testified that she is barely able to bathe or dress without assistance.  (Id.).  Plaintiff stated that her husband occasionally assists her in the bathroom and with dressing.  (Id.).

Plaintiff testified that she takes short walks outside but she does not ever go out socially.  (Id.).  Plaintiff stated that she does not go to dances, church, or participate in any other social activities.  (Id.).  Plaintiff testified that she does not watch television or listen to the radio because she cannot "listen to anybody."  (Tr. 38).  Plaintiff stated that she sleeps and takes walks during the day.  (Id.).  Plaintiff testified that her children never help her.  (Id.).  Plaintiff stated that her daughter drove her to the hearing so she would not miss the hearing but she does not help her otherwise.  (Id.).  Plaintiff testified that nobody visits her at her home.  (Id.).  Plaintiff stated that she does not know how to drive a vehicle.  (Id.).  Plaintiff testified that she could not drive a vehicle because she is illiterate.  (Id.).

Plaintiff testified that she does not know how tall she is.  (Id.).  Plaintiff stated that she weighs about 50 to 60 kilograms, which the interpreter indicated was about

120 pounds.  (Tr. 39).  Plaintiff testified that she did not know which hand was her dominant hand.  (Id.).

Plaintiff stated that she cries all night long every night.  (Tr. 40).  Plaintiff testified that she cries when things get on her nerves.  (Id.).  Plaintiff stated that she cannot handle her husband and she yells at him.  (Id.).

Plaintiff testified that her husband takes her mail to someone who reads it to him.  (Id.).  Plaintiff stated that her husband is illiterate.  (Id.).  Plaintiff testified that her husband is also deaf and sick.  (Id.).

Plaintiff stated that she has dreams about the war, which cause her to become upset.  (Id.).  Plaintiff testified that she wakes up during the night due to the dreams, and she gets up and walks around.  (Id.).  Plaintiff stated that she has these dreams every night.  (Id.).

The ALJ then concluded the hearing by stating "[g]one on this way too long. I got to get out of here.  Let's go."  (Tr. 42).

**B.    Relevant Medical Records**

The record reveals that plaintiff saw Nabiel Alkouri at St. John's Mercy Neighborhood Health Center for various complaints, including hypertension,[3] depression, cough, headache, and pain everywhere in her body, from September of

---

[3]High blood pressure.  Stedman's Medical Dictionary, 855 (27th Ed. 2000).

2001 through August of 2003.  (352-400).  Plaintiff was treated with medication.

(Id.).  It was consistently noted that plaintiff was noncompliant with prescribed

treatment.  (Id.).

Plaintiff presented to psychiatrist Luzviminda R. Santos on April 9, 2003,

upon the referral of Dr. Alkouri.  (Tr. 343).  Dr. Santos noted that one of plaintiff's

main problems was financial difficulties.  (Id.).  Dr. Santos stated that plaintiff

thinks she is a sickly person and plays the sick role.  (Id.).  She diagnosed plaintiff

with major depressive disorder[4] and borderline intellectual functioning,[5] and started

her on Celexa.[6]  (Id.).  Plaintiff saw Dr. Santos on May 9, 2003, July 25, 2003,

October 14, 2003, and November 14, 2003.  (Tr. 339-42).

On August 15, 2003, plaintiff presented to Dr. Alkouri with complaints of

chest pain, trouble breathing, and right hip pain.  (Tr. 252).  Dr. Alkouri informed

plaintiff that, due to her noncompliance with his instructions and her failure to take

her medications, she would need to find another primary care physician.  (Tr. 253).

---

[4]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbance, and feelings of worthlessness, guilt, and hopelessness.  See Stedman's at 478.

[5]An IQ range of 71-84 denotes Borderline Intellectual Functioning, whereas an IQ of 70 and below denotes Mental Retardation.  Diagnostic and Statistical Manual of Mental Disorders 45 (4th Ed. 1994) ("DSM IV").

[6]Celexa is indicated for the treatment of depression.  See Physician's Desk Reference (PDR), 1344 (57th Ed. 2003).

Dr. Alkouri stated that he would give plaintiff 30 days to find another primary care physician. (Id.).

Plaintiff presented to Family Care Health Centers on October 10, 2003 as a new patient. (Tr. 348). Denise Hooks-Anderson, M.D., indicated that plaintiff had a history of hypertension, asthma, and "what looks like depression." (Id.). Plaintiff reported a cough and shortness of breath for the past three years. (Id.). Plaintiff also complained of pain and swelling in her lower extremities. (Id.). Plaintiff's medications were described as "massive," and included Celexa, Remeron,[7] Norvasc,[8] Protonix,[9] and Compazine.[10] (Id.). Plaintiff's weight was 193 pounds. (Id.). Dr. Hooks-Anderson's assessment was cough and hypertension. (Id.). Dr. Hooks-Anderson started plaintiff on Diovan[11] and antibiotics. (Id.). She also ordered a chest x-ray. (Id.).

Plaintiff underwent a chest x-ray on October 13, 2003, which revealed that plaintiff's lungs were clear. (Tr. 346).

_____

[7]Remeron is indicated for the treatment of major depressive disorder. See PDR at 2402.

[8]Norvasc is indicated for the treatment of hypertension. See PDR at 2619.

[9]Protonix is indicated for the treatment of erosive esophagus associated with gastroesophageal reflux disease. See PDR at 3462.

[10]Compazine is an antipsychotic and tranquilizer indicated for the treatment of nausea and vomiting, schizophrenia, and non-psychotic anxiety. See PDR at 1489.

[11]Diovan is indicated for the treatment of hypertension. See PDR at 2252.

Plaintiff saw Dr. Hooks-Anderson on November 11, 2003, for a follow-up. (Tr. 327). Plaintiff complained of constant, sharp chest pain, and pain everywhere. (Id.). Upon physical examination, plaintiff complained of pain almost everywhere she was touched. (Id.). Dr. Hooks-Anderson's assessment was hypertension, uncontrolled; and fibromyalgia.[12] (Id.). Dr. Hooks-Anderson increased plaintiff's Norvasc. (Id.).

Dr. Santos completed a questionnaire on November 17, 2003, in which she stated that plaintiff tends to be anxious and overwhelmed and in a financial dilemma. (Tr. 338). Dr. Santos stated that plaintiff remains at home except to attend doctor appointments. (Id.). Dr. Santos' diagnosis was major depressive disorder, recurrent; and borderline intellectual functioning, cluster B-somatic type; with a global assessment of functioning (GAF)[13] of 55.[14] (Id.).

---

[12]A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution; additionally, there must be point tenderness in at least 11 of 18 specified sites. Stedman's at 671.

[13]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[14]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

Plaintiff saw Dr. Hooks-Anderson on December 9, 2003, with complaints of chest pain. (Tr. 326). Plaintiff reported tenderness everywhere she was touched. (Id.). Dr. Hooks-Anderson's assessment was fibromyalgia and hypertension. (Id.). She continued plaintiff on her medications. (Id.). Plaintiff saw Dr. Santos on January 6, 2004. (Tr. 235). Dr. Santos diagnosed plaintiff with major depressive disorder, recurrent; and borderline intellectual functioning. (Id.).

Plaintiff saw Dr. Hooks-Anderson on January 20, 2004, at which time she complained of pain everywhere. (Tr. 325). Dr. Hooks-Anderson noted that plaintiff was not taking her nerve pills. (Id.). Upon physical examination, plaintiff was tender everywhere she was touched and had several trigger points. (Id.). Dr. Hooks-Anderson's assessment was hypertension and fibromyalgia. (Id.). She prescribed Zantac[15] and continued plaintiff's other medications. (Id.).

Plaintiff saw Dr. Santos on February 5, 2004. (Tr. 236). Her diagnosis remained unchanged. (Id.).

Plaintiff presented to Dr. Hooks-Anderson on March 2, 2004, for a follow-up. (Tr. 324). Plaintiff continued to report pain all over her body. (Id.). Dr. Hooks-Anderson noted greater than 11 trigger points upon physical examination. (Id.).

---

[15]Zantac is indicated for the treatment of gastric ulcer. See PDR at 1689.

Her diagnosis was hypertension and fibromyalgia. (Id.). Dr. Hooks-Anderson stated that she would recommend to plaintiff's psychiatrist that plaintiff try amitriptyline[16] to help with her fibromyalgia. (Id.).

Plaintiff saw Dr. Santos on March 2, 2004, and on April 2, 2004. (Tr. 237-38). Plaintiff's diagnosis remained unchanged. (Id.).

Plaintiff presented to the emergency room on April 5, 2004, with complaints of pain on her right side and down her legs, with swelling. (Tr. 300). The clinical impression of the examining physician was abdominal pain, uncertain origin; and chest pain, uncertain origin. (Id.).

Plaintiff saw Dr. Hooks-Anderson on April 13, 2004, for a follow-up from her emergency room visit. (Tr. 323). Plaintiff complained that her "brain was spinning." (Id.). Dr. Hooks-Anderson noted that plaintiff was a very poor historian. (Id.). Dr. Hooks-Anderson stated that plaintiff's chest x-ray and abdominal CT scan were normal. (Id.). She noted that plaintiff's psychiatrist had started her on amitriptyline. (Id.). Dr. Hooks-Anderson's assessment was hypertension, leg bruise, and abnormal findings without evidence of disease. (Id.).         Plaintiff presented to the emergency room on April 24, 2004, with complaints of low back pain. (Tr. 288). The diagnosis of the examining physician

---

[16]Amitriptyline is indicated for the treatment of depression. See PDR at 1417.

was low back pain.  (Tr. 287).  Plaintiff was prescribed Demerol.[17]  (Id.).

Plaintiff saw Dr. Santos on May 4, 2004, at which time her diagnosis remained the same.  (Tr. 239).

Plaintiff presented to Dr. Hooks-Anderson on June 11, 2004, with complaints of vomiting, nausea, and eye discomfort.  (Tr. 322).  Dr. Hooks-Anderson's assessment was hypertension and abdominal pain.  (Id.).  She noted that plaintiff's was a "tough case because there are always problems with compliance."  (Id.).

Plaintiff saw Dr. Santos on July 20, 2004, at which time plaintiff reported that she was sick, she stays home most of the time, and she does not cook.  (Tr. 240).  Plaintiff's diagnosis remained unchanged.  (Id.).

Plaintiff presented to Dr. Hooks-Anderson on July 23, 2004, with complaints of pain in her back and legs, swelling in her legs, and ear pain.  (Tr. 321).  Plaintiff reported that she stopped wearing her compression stockings because they were ripped.  (Id.).  Dr. Hooks-Anderson's assessment was history of hypertension, ear pain, and leg pain.  (Id.).  She stated that she felt that a "lot of this is psychosomatic.[18]"  (Id.).  Dr. Hooks-Anderson noted that plaintiff was on a fair amount of antipsychotics, which she reported helped her and helped her sleep.  (Id.).

---

[17]Demerol is indicated for the relief of moderate to severe pain.  See PDR at 2991.

[18]Pertaining to the influence of the mind or higher functions of the brain upon the functions of the body, especially in relation to bodily disorders or disease.  Stedman's at 1479.

Dr. Hooks-Anderson prescribed Darvocet.[19]  (Id.).

Plaintiff saw Dr. Santos on August 20, 2004, at which time she reported that she was sleeping better with the amitriptyline.  (Tr. 241).  She also reported dizzy spells.  (Id.).  Plaintiff's diagnosis remained the same.  (Id.).

Plaintiff saw Dr. Hooks-Anderson for a follow-up on August 27, 2004.  (Tr. 320).  Dr. Hooks-Anderson stated that plaintiff was in better spirits than she normally was, but still reported body aches and eye pain.  (Id.).  Upon physical examination, Dr. Hooks-Anderson noted a soft tissue mass over the left clavicle.  (Id.).  Dr. Hooks-Anderson's assessment was hypertension and clavicle mass.  (Id.).  She referred plaintiff for an MRI and eye examination, and continued her medications.  (Id.).

Plaintiff saw Dr. Santos on September 21, 2004, at which time it was noted that plaintiff claimed that she was a sick woman and that she needs help due to financial concerns.  (Tr. 242).  Dr. Santos stated that plaintiff does not do many household chores "because of her sick role."  (Id.).  Plaintiff's diagnosis remained the same.  (Id.).

Plaintiff saw Dr. Santos on October 25, 2004, at which time it was noted that plaintiff had no friends in the neighborhood.  (Tr. 243).  Plaintiff's diagnosis

---

[19]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 3504.

remained unchanged.  (Id.).

Plaintiff saw Dr. Santos on December 21, 2004, at which time it was noted that plaintiff had many somatic pains and that she was dizzy all the time.  (Tr. 229).  Dr. Santos also noted that plaintiff was awaiting approval of her SSI claim.  (Id.).  Plaintiff's diagnosis remained the same.  (Id.).

Plaintiff presented to the emergency room on December 24, 2004, with complaints of dizziness following a motor vehicle accident.  (Tr. 278).  Plaintiff was found to be in no apparent distress.  (Id.).  She was discharged in stable condition.  (Tr. 279).

Plaintiff presented to the emergency room on December 26, 2004, with complaints of vomiting and head injury.  (Tr. 266).  Upon physical examination, plaintiff was found to be in no acute distress and no abnormalities were found.  (Id.).  Plaintiff was given medication and was discharged.  (Id.).

Plaintiff saw Dr. Santos on February 21, 2005, at which time plaintiff reported difficulty sleeping, pain in her head, and arthritic pain.  (Tr. 230).  Plaintiff's diagnosis remained unchanged.  (Id.).

Plaintiff presented to St. Alexius Hospital for a physical therapy evaluation on March 14, 2005.  (Tr. 246-47).  Plaintiff's diagnosis was listed as fibromyalgia and back pain.  (Tr. 246).  Plaintiff reported difficulty with bending, walking, and

preparing dinner secondary to pain.  (Id.).  Extension exercises progressing into mobility training were recommended.  (Tr. 251).

Plaintiff saw Dr. Santos on March 21, 2005, at which time it was noted that plaintiff was sleeping much better on Elavil.  (Tr. 231).  Dr. Santos also noted plaintiff's somatization.  (Id.).  Plaintiff's diagnosis remained the same.  (Id.).

Plaintiff saw Dr. Santos on April 20, 2005, at which time it was noted that plaintiff is always sick.  (Tr. 232).  Plaintiff's diagnosis was changed to bipolar disorder,[20] mixed episode; and somatic pain.  (Id.).

Plaintiff saw Dr. Santos on June 10, 2005.  (Tr. 233).  Plaintiff reported that she "can't handle [any]body," and "can't stand noises."  (Id.).  Plaintiff's diagnosis changed back to major depressive disorder, recurrent; and borderline intellectual functioning.  (Id.).

Plaintiff saw Dr. Santos on July 11, 2005, at which time it was noted that plaintiff had been going out more often.  (Tr. 234).  Dr. Santos encouraged plaintiff to take her medications.  (Id.).  Plaintiff's diagnosis remained major depressive disorder, recurrent; and borderline intellectual functioning.  (Id.).

Plaintiff saw F. Timothy Leonberger, Ph.D., for a neuropsychological

---

[20]An affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression.  Stedman's at 526.

screening evaluation at the request of the Commissioner, on August 1, 2005. (Tr. 197-202). Plaintiff was described as a poor informant. (Tr. 198). Plaintiff was found to be alert and oriented to her surroundings, although she was unable to tell Dr. Leonberger the date, responding that she was illiterate. (Tr. 199). Plaintiff's thinking was generally logical, although she continually commented about her pain and inability to do most things. (Id.). Plaintiff's mood was described as depressed and her affect as sad and irritable at times. (Id.). Dr. Leonberger stated that plaintiff's attention/concentration was "voluntarily poor." (Tr. 200). He noted that plaintiff put forth little or no effort to perform the tasks that were presented to her and was very uncooperative. (Id.). Dr. Leonberger determined that plaintiff's test results were not valid or reliable. (Id.). Dr. Leonberger stated "[i]n my 18-year history of performing disability evaluations, I have rarely run across an individual who was as blatantly uncooperative as Ms. Omerovic. She made little attempt to try even easy items presented to her. Therefore, there is no way of determining her intellectual level." (Tr. 201). Dr. Leonberger expressed the opinion that plaintiff "greatly exaggerates her report of pain," in light of the fact that there has been little objective medical information to substantiate her report of pain, which suggests a

diagnosis of Factitious Disorder.[21]  (Id.).  He described Factitious Disorder as the

intentional reporting or feigning of pain to assume the "sick role."  (Id.).  He stated

that plaintiff's major concern with health professionals has been her level of pain

and suffering.  (Id.).  Dr. Leonberger's diagnosis was: Factitious Disorder, with

predominantly physical signs and symptoms; Dysthymic Disorder;[22] and Probable

Borderline Intellectual Functioning; with a GAF of 40[23] currently, and 40 as the

highest in the past year.  (Id.).  Dr. Leonberger assessed plaintiff's functional

limitations as follows: (1) Activities of Daily Living: Dr. Leonberger deferred a

rating in this area because he did not believe plaintiff reported her activities of daily

living accurately; (2) Social Functioning: marked impairment due to her major focus

on her pain; (3) Concentration, Persistence and Pace: Dr. Leonberger did not assess

plaintiff's concentration or memory due to her lack of cooperation; he found that

plaintiff had a marked impairment in her persistence and pace due to her insistence

on reporting her subjective experience of pain; and (4) Deterioration or

_____

[21]A mental disorder in which the individual intentionally produces symptoms of illness or
feigns illness for psychological reasons rather than for environmental goals.  Stedman's at 526.

[22]A chronic disturbance of mood characterized by mild depression or loss of interest in
usual activities.  Stedman's at 526.

[23]A GAF score of 31-40 denotes some impairment in reality testing or communication
(e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas,
such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids
friends, neglects family, and is unable to work).  DSM-IV at 32.

Decompensation in Work or Work-Like Settings: marked impairment in this area due to plaintiff's lack of schooling or work history, medical problems, and psychiatric illness. (Tr. 202). Finally, Dr. Leonberger expressed the opinion that plaintiff is not capable of handling funds in her own best interest. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since November 1, 2000.
2. The medical evidence establishes that the claimant has hypertension and depression, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, of Regulations No. 4.
3. Although the claimant alleges back pain and emotional problems, claimant's allegation of disabling pain and depression are not credible for the reasons enumerated in the decision.
4. There is no objective medical evidence to demonstrate that the claimant's impairments have more than a minimal effect upon her ability to perform work-related activities.
5. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920). (Tr. 20).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application protectively filed on October 14, 2003, the claimant is not entitled for Supplemental Security Income under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Id.).

**Discussion**

**A.     Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See</u> <u>id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See</u> <u>id.</u>  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the

burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review. See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R.

§§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:  activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.**    **Plaintiff's Claim**

Plaintiff raises a single claim on appeal of the decision of the Commissioner. Plaintiff argues that the ALJ erred in evaluating the medical opinion evidence.

Specifically, plaintiff contends that the ALJ failed to give proper weight to the opinion of plaintiff's treating psychologist, Dr. Santos, regarding plaintiff's mental impairments.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "[t]he opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). However, such opinions do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be

discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).  An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole.  See Johnson, 240 F.3d at 1148.

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report.  See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  However, an ALJ is not required to discuss every piece of evidence submitted.  See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998).  If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion.  See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

After summarizing the objective medical evidence, the ALJ concluded that there was no medical evidence to demonstrate that plaintiff's impairments, alone or in combination, impose a limitation that significantly limits plaintiff's ability to perform work-related functions. (Tr. 17). With respect to plaintiff's physical impairments, the ALJ found that there is no medically acceptable evidence to conclude that plaintiff has any impairment which could cause her pain. (Tr. 17). Plaintiff does not dispute the ALJ's findings regarding plaintiff's physical impairments. The ALJ's determination that plaintiff does not have a severe physical impairment is supported by substantial evidence in the record.

With regard to plaintiff's mental impairments, the ALJ found that plaintiff is no more than mildly impaired in her activities of daily living and social functioning because of her depression, has no limitation in concentration, persistence, and pace, and no "real episodes of decompensation." (Tr. 16). The ALJ acknowledged that Dr. Leonberger, the consulting psychologist, indicated that plaintiff's factitious disorder would meet the listings, but assigned "little weight" to this conclusion. (Id.). The ALJ also noted that Dr. Santos, plaintiff's treating psychologist, found that plaintiff was "significantly more limited that the undersigned has concluded." (Tr. 17). The ALJ indicated that he was giving "little weight" to Dr. Santos' assessment of the severity of plaintiff's condition. (Id.).

The undersigned finds that the ALJ erred in assigning little weight to the opinion of Dr. Santos. Dr. Santos began treating plaintiff in April of 2003. (Tr. 343). At that time, she diagnosed plaintiff with major depressive disorder and borderline intellectual functioning, and started her on Celexa. (Id.). Dr. Santos saw plaintiff four more times in 2003. (Tr. 339-42). On November 17, 2003, Dr. Santos completed a questionnaire, in which she diagnosed plaintiff with major depressive disorder, recurrent; and borderline intellectual functioning, cluster B-somatic type; with a global assessment of functioning (GAF) of 55. (Id.). Dr. Santos continued to see plaintiff on approximately a monthly basis, during which her diagnosis remained unchanged. (Tr. 230-243). On April 20, 2005, Dr. Santos changed plaintiff's diagnosis to bipolar disorder, mixed episode; and somatic pain. (Tr. 232). On plaintiff's next visit, however, Dr. Santos changed plaintiff's diagnosis back to major depressive disorder, recurrent; and borderline intellectual functioning. (Tr. 233). Plaintiff's diagnosis remained unchanged at plaintiff's last visit on July 11, 2005. (Tr. 234).

The ALJ indicated that he was assigning little weight to the opinion of Dr. Santos regarding the severity of plaintiff's mental impairments because Dr. Santos' assessment was based almost exclusively on plaintiff's own report of symptoms rather than any clinical observations. (Tr. 17). The ALJ stated that there are frequent references to plaintiff's financial difficulties in Dr. Santos' treatment notes,

and little or no signs of "emotional difficulty." (Id.). The ALJ concluded that Dr. Santos is "likely motivated by the treating relationship and a desire to support the claimant through those assessments." (Id.). Although Dr. Santos consistently diagnosed plaintiff with borderline intellectual functioning, the ALJ did not discuss this impairment.

Dr. Santos has been plaintiff's treating psychologist since April of 2003. Dr. Santos saw plaintiff on almost a monthly basis from that time through the date of the hearing. Dr. Santos' opinion should thus be accorded significant weight. Dr. Santos consistently diagnosed plaintiff with major depressive disorder and borderline intellectual functioning and treated plaintiff's depression with psychotropic drugs. Dr. Santos also regularly noted plaintiff's desire to play the "sick role," plaintiff's multiple somatic complaints, and plaintiff's financial difficulties. On November 17, 2003, Dr. Santos assessed a GAF score of 55, which is indicative of significant impairment in functioning.[24] (Tr. 338). As such, Dr. Santos clearly believed that, despite plaintiff's known financial problems and desire to play the sick role, plaintiff did in fact suffer from a severe mental disorder. There is no support for the ALJ's finding that Dr. Santos was motivated by the treating relationship to support plaintiff's disability applications. Rather, Dr. Santos opinion

_____

[24]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

regarding the severity of plaintiff's mental impairment is supported by her own treatment notes.

Dr. Santos' opinion regarding the severity of plaintiff's mental impairments is also supported by the opinion of consulting psychologist Dr. Leonberger. Dr. Leonberger diagnosed plaintiff with factitious disorder, with predominantly physical signs and symptoms; dysthymic disorder;[25] and probable borderline intellectual functioning; with a GAF of 40[26] currently, and 40 as the highest in the past year. (Id.). Dr. Leonberger found that plaintiff had a marked impairment in social functioning due to her major focus on her pain; a marked impairment in her persistence and pace due to her insistence on reporting her subjective experience of pain; and a marked impairment in the area of deterioration or decompensation in work or work-like settings due to her lack of schooling or work history, medical problems, and psychiatric illness. (Tr. 202). Dr. Leonberger also expressed the opinion that plaintiff is not capable of handling funds in her own best interest. (Id.). As the ALJ pointed out in his decision, Dr. Leonberger's findings are supportive of the presence of a mental impairment that would meet a listing. Thus, Dr.

---

[25]A chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. Stedman's at 526.

[26]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

Leonberger's assessment of the severity of plaintiff's mental impairments is consistent with that of Dr. Santos, and indicative of a severe mental impairment.

In sum, the ALJ's finding that plaintiff does not have a severe mental impairment is not supported by substantial evidence in the record. Every psychologist that examined plaintiff expressed the opinion that plaintiff's mental impairments were severe. The objective medical evidence of record reveals that plaintiff suffers from depression, borderline intellectual functioning, and possibly factitious disorder, which have more than a minimal effect on her ability to perform work-related activities. This objective medical evidence cannot be ignored solely due to plaintiff's questionable credibility. There is no other medical evidence upon which the ALJ relies to support his conclusion that plaintiff's mental impairments are not severe.

Accordingly,

IT IS HEREBY ORDERED that this cause is reversed and remanded to the ALJ in order for the ALJ to accord the proper weight to the opinion of Dr. Santos, formulate a residual functional capacity for plaintiff based on the medical evidence in the record, and to order, if needed, additional medical information addressing plaintiff's mental residual functional capacity.

A separate Judgment of Reversal and Remand is entered this same date

Dated this 6th day of September, 2007.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE